22-12863 Jared McGriff et al v. City of Miami Beach May it please the court Hold on one second, let everybody get settled in Mr. Levine Okay, we're ready May it please the court, my name is Alan Levine for the plaintiffs. Memorial Day Weekend 2019, the City of Miami Beach paid for a public exhibit of art. It was entitled Reframe Miami Beach. Its purpose was to spark conversations about blackness and inclusion and to tell stories from and with different points of view. One piece of art that was on display was entitled Memorial to Raymond Harris. Raymond Harris was a Haitian-American who had been shot multiple times by the Miami Beach City Police several years earlier on Memorial Day Weekend. When a policeman walked into the exhibit or into the installation where the Harris work was being displayed, he called the city manager and complained, said it was offensive to the police. The city manager sent somebody down to look at it. When that person reported back to the city manager, he The district court held that this act of political censorship was immune from constitutional review because reframe was government speech. Right, so let me ask you a couple of hypothetical questions, Mr. Levine. Given your position on whether or not this is or is not government speech, would the city have been involved in viewpoint discrimination if it decided to only display the painting for six hours a day? If the city had entered into an agreement? No, no, no, no, same agreements we have here. I'm not changing anything of this record except the city decides we're just gonna put it up for six hours a day, seven hours a day, eight hours a day, but that's all it's gonna get. And just that one picture with no explanation? Yes. Well, same thing is here except that instead of taking it down permanently, it just puts it up for six hours a day. Well, if for example they have rotating hours. No, no, no, no, I'm not giving you any other facts. Same facts as here, but when the police officer complains, the city manager decides the way I'm gonna resolve this problem is I'm gonna leave it up for only six hours a day. So it's going to be up from 10 in the morning to 4 in the afternoon and then I'm taking it down and tomorrow morning I'll put it back up again and I'll take it back down again at 4. Is the city engaged in unconstitutional viewpoint discrimination? Absolutely. So the city has to have it up for 24 hours a day? If the entire exhibit is open for 24 hours then it has, I mean, if the show is only open for eight hours, that's one thing, but I assume from your hypothetical. The city has no control. Your point is that once the, let me, I don't want to put words in your mouth, but I think your position is that as a First Amendment matter, once the city commissioned this piece of art, it lost control over what to do with it. Is that too broad a proposition or is that what you're asserting? I would modify the hypothesis this way, your honor. The city didn't commission this piece of art. The city authorized the curators to mount an exhibit that would tell stories from different perspectives. The memorial to Raymond Harris told a story from a different perspective. It happened that the city didn't like it. The city can't take it down and it can't take it down for only a limited period of time. It has no power. Even though it owns the art worker. Well. I mean, you don't put any stock in that factor. The agreement says all reports, documents, article, devices, and or work produced in part or in whole under this agreement are intended to be the sole and to any application for copyright or patent by on behalf of the consultant or employees or sub consultants without the prior written consent of the city manager. Well, that ownership provision doesn't help the city's government speech. Why not? Because ownership doesn't really have anything to do with government speech. Nothing at all? Well, it's mentioned in a couple of The city contracts with these same artists, not the consultant, with these same artists to create the same painting. And they say, you know what? We're gonna put it up next Memorial Day. If you can complete it by the end of the year, we'll put it up next Memorial Day. Artwork gets produced. The city decides, not a good idea. We're not gonna put it up. Viewpoint discrimination? If there's some evidence that they don't put it up because they don't like. Of course, this is, yeah, they don't like it. They don't like its point of view, then they have no right to take it down because. They never put it up in the first place. Well, I understand, Your Honor. I mean, this is a different, this is, this is only my But it seems to me that all of the government speech cases that everybody has talked about and discussed in the briefs don't address the scenario where a government entity purchases something, in this case art, and then decides what to do with the art. If they just, if the city decides, we're gonna get this, we're gonna buy this piece of artwork, and we're gonna put it up permanently, permanently on Lincoln Road. New administration comes in after an election and decides, not a good idea. We're gonna take it down. Is there unconstitutional viewpoint discrimination? Not necessarily. Why? The second administration disagrees with the message. Well, if, in fact, a government entity removes a piece of art because it doesn't like its message, I mean, Mayor Giuliani learned that lesson with regard to the Brooklyn Museum case. He said the ordered the museum to take it down. The court said you can't do that, can't do that here. The government simply doesn't have the right to mount or take down art because it doesn't like the viewpoint, unless it has specific arrangements. For example, we want you to produce art that celebrates America's victories in war. If the agreement had said the city gets to decide whether or not to put up any of the materials that the curator has obtained, is there a violation of the First Amendment? Well, if, in fact, the curator, the curator gets a contract and the city says, get 15 pieces of art. They can be different. They can be sculpture, they can be papier-mâché, they can be paintings, they can be anything you want. 15 pieces of art commemorating the same theme. We'll pick 10 of them and they pick 10 and they don't pick your clients. Is there unconstitutional viewpoint discrimination because they don't agree with your clients perspective? No, it's a different case. Why? Because it's not the agreement here. So this, so this, so the First Amendment argument depends on the agreement? To some extent, sure. If, for example, the city had an agreement with... Why is the First Amendment subordinate to a contract between entities or parties? Well, for example, the government can, in fact, hire artists to promote a particular point of view. That's what the government-sponsored rally to celebrate victory in war. And if somebody says, I want to come to that rally because I want, and oppose the war, the government has the right to say, no, this is our speech. That's what the government speech doctrine allows the government to do. And a lot of that depends on what the majority of government speech doctrines cited in the party's briefs. Many of them depend on precisely that. What's the agreement between the government and the parties? This court's decision, for example, in Leak v. Drinkard, a parade, the right of people to participate in the parade, normally protected by the First Amendment, were restricted because the government had explicitly said to those who were applying for the parade, you have to have a certain point of view, a certain message. Government speech doctrine allows the government to have to do that, to enlist particular points of view to further the government's interests. But that's not what it did here. It said to the curators, you should produce art on the theme of blackness and inclusion, and you should tell stories from different perspectives. Not tell our story, not tell the government story, you tell stories from different perspectives. What the city did here was, in fact, if you had the, and then this is my last question, and then we'll turn it over to your colleagues. If one of the pieces of art created had a racially incendiary message, was the city constitutionally required to put it up and keep it up on Lincoln Road for the That allows government to restrict certain speech in certain settings. None of this would have fallen into any one of those prohibited categories. It's not obscenity, it's not non-protected speech, it's just racially incendiary. The city of Miami Beach is, and has always been, discriminatory toward African-Americans and minorities. It will always stay the same way. Shame on the city of Miami Beach. And it's a black background with all the words in white. That's the piece of art created. The city says, you know, I'm not gonna put that up. You point discrimination? That's this case, your honor. The city manager found this piece of art incendiary. Right, so you're saying that there's no control once the city decides. Once the city hires people, I'm sorry to interrupt you, your honor. No, no. Once the city hires, I mean, you're talking about the context of this against the city's history for racial discrimination. It hires African-American curators and say, tell the story of the history of Miami Beach and race relations from different perspectives. And they choose to do so. And one of those perspectives is Raymond Harris being shot multiple times by the cops, the police, and the city manager thinks that's incendiary. He doesn't have that power. That's clearly viewpoint discrimination. So there's no control, right? The city loses all control once it commissions the pieces with a certain theme. You know, that's unconstitutional conditions doctrine. Once the government pays money, it loses control except under those circumstances in which it has designated control. Public forum doctrine allows the government to make all sorts of restrictions on public speech. But viewpoint discrimination is not something that the Constitution permits the government to exercise. All right, Mr. Rosenwald. You know, Justice Thurgood Marshall was known for asking questions at oral argument that had nothing to really do with the legal issues in the case. But since he had been through so much on the ground, granular litigation, he always wanted to know the answer to these questions. And the answer is, what in the world were you thinking? And that's the question I asked myself in this case. Like, what in the world was the city of Miami Beach thinking? This is not a piece of art that shows the decedent on the ground riddled with bullet holes, bleeding, with police officers standing over him with their smoking guns. It is as innocuous a piece of art as I think I've seen. You don't have to answer the question. Well, you do make the point. It's just nuts. Well, it was a policy call. Whether it was good or bad, we can certainly debate for sure. But whether the city had the legal authority to do it is what we're here to address. And clearly, under your precedent, the city did have the legal authority, both under the government speech doctrine and the employee speech doctrine. I'm Robert Rosenwald. I'm with the city of Miami Beach. I have my colleagues here at council table. And first of all, I wanted to say it's always my greatest pleasure to appear before this court on an interesting First Amendment case. And this one is no different. However, while this case is interesting, it isn't particularly complicated. In fact, an admission contained in a single sentence in Appellant's initial brief defeats their First Amendment claim under both government speech doctrine and the employee speech doctrine. Let me read you that sentence from page 19 of the Appellant's initial brief in the summary of the argument. Quote, in the spring of 2019, the city of Miami Beach engaged the plaintiff curators to create on public property an art exhibit to be funded by the city. Now, what does your controlling precedent say when the city of Miami Beach engaged the plaintiff curators to create on public property an art exhibit to be funded by the city? On the government speech doctrine, the Supreme Court stated in the Sumam case that, quote, it is obvious that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech. Obvious. That rule has been applied and affirmed by the First Circuit beyond monuments to the context of art generally in Newton v. LaPage, which we filed as supplemental authority. That case involved the removal of a pro-labor piece of art that the city had put up and taken down. Now, are there no limits once a municipality or a government entity commissions something? There are no constitutional limits. Now, the city, once the city, and I'm just reading Sumam, what Sumam says is, quote, obvious. Once the commission, once the city commissions artwork to pay for it with public funds and to put it on public land, it is obviously government speech. And if it's government speech, they can do what they want with it. They can take it up, they can put it up, they can take it down, they can throw it away. That's, it is the government. They own it. And I would say also, under the employee speech doctrine, similarly this court has under Rahman v. Walker, quote, the controlling factor in Garcetti was that Sobolos' statements were made pursuant to his job duties. The Supreme Court in this court stated when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes. But these artists are not public employees in the normal traditional sense. They're not, but under the... They're contractors. Under the protection and the limitations on First Amendment right extend to independent contractors. And various courts have applied that to extend also to subcontractors who are not direct signatories to the contract. What this admission in plaintiff's initial brief means, in light of these bright line statements of the government speech and employee speech doctrine can be simply stated. When the government hires contractors to produce art and put up art on the wall that it likes, they cannot veto the city's choices and put up whatever they want. If this court were to establish such a First Amendment right for the first time in American jurisprudence, it would mean the end of the government's ability to patronize the arts and to produce events using works of art. For what would the limits of that public land's proposed new constitutional right be? And you alluded to this, Your Honor. Could the government create a memorial at the city event that the Appalachians were hired to produce and over the city's objection that honored, say, the DC sniper, John Allen Muhammad, who was another black man killed by the government? What about memorializing Nathan Bedford Forrest, founder of the KKK, because it would provoke discussions from different points of view? Or even Adolf Hitler, because some believe accounts of the Holocaust are government propaganda. Plaintiff's expert in this case testified that the city would have been perfectly within its rights to remove those artworks that I just mentioned to you, because people might have people would have been offended by them because it would be offensive. But she testified that she did a removal of the Harris Memorial could not was unconstitutional because she could not imagine anyone being offended by it. This is the rule that the plaintiffs ask you to create for contractors hired to produce a city event. And just like it itself to, and it would end, it would result in the end of government patronage of the arts altogether. Fortunately, no case anywhere has ever established anything like the right espoused by the appellants. But applying traditional government speech and employee speech analysis, plenty have rejected it. And I'll turn first to the government speech analysis. And I'll spend some time on the control element since in the appellants brief, that's where they put their attention. And then I'll get to the other things. If we have time, if there's something that you want me to address on the other factors first, of course, feel free to ask. Does it matter more what the contract says or where the artwork was going to be located? Does it matter more? Well, it's it's equally important. The contract says the government can approve or not approve the artwork. It says that the government owns the artwork, which, contrary to my opposing counsel's position, the government speech cases say ownership is definitely a factor in control. In fact, in Shurtleff, which they cite, and I'll go through all of the Shurtleff factors if we have time. But one of the big ones was they said, in Pleasant Grove, Utah, the city took ownership of the monuments. And in the Shurtleff case in Boston, the city didn't take ownership of the flags. And that was one important factor that they looked at to say that Boston did not have control over the flags that it was flying. It was a reasonable appreciation of a typical citizen matter. Like the my understanding is that the portion of Lincoln Road where this was going to be set up was not traditional government property had been leased by the city. Is that right? That's correct. And Judge Ungaro found correctly pursuant to the city code that that was temporarily public property. Also, does it matter whether or not passersby would think that this was a city message or does that not matter? Well, I would say in this case, under the facts of this case, it's pretty clear that this was a very abbreviated timeline that they had to put this together. This particular space, they didn't get into the night until the night before it was to open. And so the city had no chance to look at the storefront or the art itself until the morning of Saturday, the 24th. And in fact, the contractors themselves testified and I give you the citations to their deposition testimony, Octavia Yearwood and Naomi Guerrero both said they never saw the artwork until that morning. They had they never even knew that there was going to be a Haris memorial until that morning. And that was the first time that the city or they saw it. And that was when the decision was made. But to answer your question as to whether someone could tell that this was a city event, the record is replete with city employees taking control, making sure that the city's endorsement of this event is made perfectly clear. And I can read you a there. Was there something at the site that indicated that this was sponsored by or put together by or done at the behest of the city that was required by the contract? And it was Now, I know I know what the contract said. I'm asking whether the site actually had that sort of signage. Actually, I don't know, Your Honor. All we have in the record is a partial one sided picture that the appellants took of the storefront where they did not list the city as the sponsor. They did not put the city's logo. They did not put the name of the event as they were contractually required to do as reframe Miami Beach, but just said reframe in that one picture. We don't know. It's not in the record what was inside the establishment as to the endorsement or the ownership of the city of Miami Beach. But I can tell you that the reframe event overall, the record is replete with Matt Kenny and and his colleague who were managing the project telling these every single thing you do in this case needs to say Miami Beach, reframe Miami Beach. It needs to have our logo on every single thing. And they say they go so far to say please do this because this comes down directly from the Commission. The Commission wants everybody to know that this is our event. So what I would say is I'm curious how much did the city pay to create the event? Do you know? The record tell us. The record says that it was somewhere around $100,000 for the for the entire reframe Miami Beach event. How much? And was the event advertised other than on-site? Yes, the city of Miami Beach advertised it through press releases that it sent. It was advertised by emails that the tourism department sent. It was advertised. But is any of that in the record? Oh yes, I can I can. There's advertisement for the event with the city logo on it in this record you're telling the court. Oh for sure, for sure. Let me in fact if you have any question I thought that was clear but if you have any question that that that's not just let me go through the list. I'm just following up whether there was on-site signage and you were candid about the picture so I'm asking about the advertisement that preceded it and you're saying that's in the record and you can just give me a couple of sites I can look at and confirm it. Absolutely, I can do that. If they're handy, if not I'll figure it out. No, no, they are handy. I don't want to take your time. The clock's ticking so I'll look for that. You tell me there in the record. No worries. At ECF 18-1, the front of the advertisement flyer marketing the Reframe Miami Beach opening reception said join us for a sunset cocktail as the City of Miami Beach and Reframe launched their inaugural festival. The back of the flyer marketing the opening reception. I'll see what it says the flyers at EC 18-1. 18-2. 18-1 is also 18-1 Yearwood admitted that the press releases identified two city employees as the individuals to be contacted for more information. You've answered the question, I'll look for it, thank you. Okay, then if I could just go on if you don't have any more questions in that vein. I would say that I would I'd like to point on the control factor to three of your precedents in my remaining time. Gundy, Shurtleff, and Leake. In the Gundy decision, the court said, quote, the City Council exerts control over the messages conveyed by invocation speakers because inviting speakers to give invocations inherently exhibits governmental control over the invocation messages from the outset of the selection process. Mr. Gundy was the literal speaker but he was allowed to speak only by virtue of being invited by a City Council member. Selecting one speaker over another exhibits control. So under your very recent Gundy decision which is post-Shurtleff, the act of selecting who is going to speak is qualitatively and quantitatively different than cases where the general public like in Shurtleff was invited for years and years and years to come in and no one was ever turned down until someone wanted to put up a Christian flag and then they were turned down. It's just a totally different situation under Gundy. Turning to Shurtleff, the city of Miami Beach, all of the factors that Shurtleff listed support the city as well. In Shurtleff, the city said the city's practice was to approve flag raisings without exception. It has no record of denying a request until Shurtleff. Here the opposite is true. The entire reason the appellants were chosen at the very last minute was because the city manager didn't like the programming decisions of the previous contractor hired to do the same job and had terminated that contract for convenience. Also, again, I told you about the ownership contrast made by the city. Boston told the public that it sought to accommodate all applicants who wish to hold events at Boston Public Forums, including the City Hall Plaza, but in this case that's the opposite. The city of Miami Beach had no interest in accommodating everybody who came to apply. They did the opposite. They hired somebody as an independent contractor to come in, produce, and put up art that they liked, and that was what they expected under the contract and under the First Amendment they were allowed to expect. I see that my time's up. If you don't have any other questions, I'll sit down. All right, thank you very much. Both in terms of questions put to my colleague and one that you put to me, Judge Jordan, concerning whether once the city commissioned the art, its power to exercise control, it could have done what it did not do here, and that is try to control ReFrame's message. My colleague, I'm sure... What could it have done in your view? Well, between the time my client started working on this case, on this project on ReFrame and the exhibit itself, there were some ten weeks. Two city employees were responsible for supervising that work, Matt Kenney and Brandy Reddick. During those ten weeks or so, they spoke almost daily to my clients. They exercised some control over logistics like budget and location. Never once did they ask to see any of the art. They testified without rebuttal that at no time did they try and find out what art the curators intended to produce. What could the city have done? They could have met with the curators and said, we have a particular message you want us to convey, and we want to make sure that the art conforms to that message. And if they would have seen the painting ahead of time and said, that doesn't really conform to our message, could the city have not displayed the painting? Well, I mean, you asked before, your honor, whether or not contracts have anything to do with First Amendment rights, and they do, and they could have had a contract here that said, well, we want to make sure that this exhibit is not only about blackness and inclusion, but it depicts Miami Beach's history in a favorable light. If they want to write that into the contract, they probably couldn't have hired my clients, but they had the right to do that. If it had done that, are you saying, let's say that that interaction had occurred, that back at the beginning of week one, the city's representatives had said to your client, the client had said what he was intending to do, and the city's representatives had said, yeah, I'm a little more concerned about that, we need you to refocus, do something else. Are you saying that would have been okay? Well, to the extent that we're talking about trying to enforce the contract, they have to be able to say, this isn't about blackness and inclusion, you're not telling stories about that from different points of view. If that's the case, yes, they have that right. They don't have the right under that contract to say, we don't like that you're depicting the police unfavorably, even if it is part of Miami Beach history. They didn't have that right under this contract. Okay, so your position then is not that they could have come in week one and said, you can't do this, if they had known what he was doing. Your position is the same, regardless of when it occurred in the process, that the city of Miami Beach said, you know, we're not going to display this because we don't agree with a message, or it's not something that, we may agree with the message, but it's not something we want to display on behalf of the city. It wouldn't have mattered when during the period, well, they had that conversation. Well, that's right, but to the extent, I mean, that's a contract issue, Your Honor, and the city hasn't argued. I understand, I'm asking it as a constitutional question, though, because when you first started speaking, I thought your point was that it would have been fine if they had done it earlier. I'm just trying to understand what your position is. I think you're saying it doesn't matter from a constitutional standpoint. Yes, Your Honor, and I say that because what the government speech cases tell us, and particularly Shirtleft versus City of Boston. I don't take issue with you. I think that if they couldn't do it when they did it, then they couldn't have done it earlier, and if they could do it when they did it, then they could have done it earlier. That's exactly right, sweetheart. Excuse me, Your Honor. Your position is that the only time that the city could have done anything substantive with regards to message was at step one of the contracting process by refining the scope of the agreement, right? Or the only thing it could have done. After that, it loses complete editorial and ownership control. The government speech cases tell us, yes, they have to exercise active control before simply taking it down. The city never did that. They simply took it down. During those ten weeks, it exhibited no interest whatsoever in the message being conveyed by this art. You told us that doesn't matter. It matters because the act of censorship for government speech purposes is not exercising control over the message. Shirtleft makes that very explicit, though many other cases imply as much. Namely, that control means that the government, in Shirtleft's words, is crafting a message, and that's what government speech is about. In this case, there was no government speech because the government had left it to the curators. Okay, we